**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSEPH STEPHENSON, | ) | 3:22-CV-00644 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOSQUE, *et al.*, | ) | |
| *Defendants*. | ) | March 31, 2026 |

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

Plaintiff Joseph Stephenson, a sentenced inmate in the custody of the Connecticut Department of Correction ("DOC"), brought this action *pro se* alleging certain prison officials violated his constitutional rights stemming from an incident in his cell on May 8, 2019. After initial review, Plaintiff's remaining claims include: First Amendment retaliation against Defendant Gardiner; Eighth Amendment excessive force and failure to intervene claims against Defendants Gardiner, LaMountain, Bosque, Andreas, Mihaliak, O'Neil, and Yohe; Eighth Amendment deliberate indifference to medical needs against Defendant Nurse Burns; Eighth Amendment conditions of confinement against Defendant Dr. Zahedi; and Fourteenth Amendment due process violations against Defendants Leone and Tugie. Am. Initial Review Order, ECF No. 62.

Defendants have moved for summary judgment as to all of Plaintiff's remaining claims. For the following reasons, Defendants' motion, ECF No. 188, is **GRANTED IN PART AND DENIED IN PART**. Specifically, the motion is GRANTED with respect to all claims except the First Amendment retaliation claim against Defendant Officer Gardiner and the Eighth Amendment excessive force and failure to intervene claims alleged against Defendants Officer Gardiner,

Officer LaMountain, Lieutenant Bosque, Officer Andreas, Lieutenant Mihaliak, Officer O'Neil, and Officer Yohe.

## I.    FACTUAL BACKGROUND

The following facts, drawn from Defendants' Local Rule 56(a)1 statement, Plaintiff's Local Rule 56(a)2 statement, and the supporting exhibits, are undisputed except as otherwise noted, and disputes are noted only if supported by evidence in the record.[1]

### A.    May 8, 2019, Incident

On May 8, 2019, Plaintiff was housed at MacDougall-Walker Correctional Institution ("MacDougall CI").  Defs'. L. R. 56(a)1 St. ECF No. 188-11, ¶ 1.  Around 8:00 that evening, prison officials were conducting cell compliance inspections in the pod in which Plaintiff resided (P-Pod).  *Id.* ¶ 4.  Defendant Officer LaMountain reached Plaintiff's cell at 8:14 p.m., and directed Plaintiff to remove non-authorized items from his cell.  *Id.* ¶ 5.

---

[1] Local Rule 56(a)1 requires a party moving for summary judgment to file "a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." D. Conn. L. Civ. R. 56(a)1.  Local Rule 56(a)2, in turn, requires the party opposing summary judgment to submit a Local Rule 56(a)2 statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 statement and indicating whether the opposing party admits or denies the facts set forth by the moving party. D. Conn. L. Civ. R. 56(a)2.  Each denial must include a specific citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)3.

The Court has reviewed all of Plaintiff's voluminous and piecemeal submissions in assessing his claims.  *See* ECF Nos. 202 (containing portions of Plaintiff's Local Rule 56(a)2 Statement); 204 (containing Plaintiff's declaration opposing Defendants' summary judgment motion, which is duplicated in part at ECF No. 211); 205 (containing Plaintiff's supplemental arguments concerning qualified immunity); 206 (containing portions of Plaintiff's Local Rule 56(a)2 Statement); 208 (containing 175 pages of unorganized exhibits); 209 (containing 178 pages of unorganized exhibits); 210 (containing Plaintiff's Local Rule 56(a)3 Statement of Additional Material Facts); 211 (containing Plaintiff's full supplemental declaration), and 215 (containing Plaintiff's complete Local Rule 56(a)2 Statement). Although Plaintiff submitted a Local Rule 56(a)2 statement, ECF No. 215, he does not consistently cite evidence to support his denials of facts.  That Plaintiff is unrepresented does not excuse him from complying with the Court's procedural and substantive rules.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006). Accordingly, the Court only considers those denials supported by admissible evidence, and the facts contained in Defendants' Local Rule 56(a)1 statement, where supported by evidence of record, are deemed admitted.  *See* D. Conn. L. Civ. R. 56(a)3 ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions[.]").

Upon receiving this instruction, Defendants submit (and Plaintiff denies) that Plaintiff removed his clothing and threw it at Defendants, yelled profanities at Defendants, and ran towards his cell door. *Id.* ¶ 6; Pl.'s L.R. 56(a)2 St., ECF No. 215, ¶ 6. Defendants contend they called a "signal 11," which Plaintiff disputes; Defendants then state they attempted to secure Plaintiff. ECF No. 188-11 ¶ 7; ECF No. 215 ¶ 7. During these events, Defendants submit (and Plaintiff denies) that Plaintiff struck Defendant Andreas, and Andreas sustained a laceration to his nose. ECF No. 188-11 ¶¶ 8–9; ECF No. 215 ¶ 8. Plaintiff sustained a laceration to his thumb. ECF No. 188-11 ¶ 13.

After the altercation began, Defendant Gardiner entered Plaintiff's cell to assist Defendants LaMountain and Andreas. *Id.* ¶ 9. Defendant O'Neil arrived to operate the camera. *Id.* ¶ 11. Defendant LaMountain assisted Plaintiff in putting on boxers before he was moved to the Restrictive Housing Unit ("RHU"). *Id.* ¶ 10.

Based on the incident, prison officials contacted the Connecticut State Police, and video evidence was preserved. *Id.* ¶ 16. The video evidence (three videos in all) was submitted as an exhibit to Defendants' motion, and review of those videos contribute additional details. Video Exhibits, ECF No. 188-4.

The first video ("Video 1")[2] is eight hours and two seconds of footage—from 4:00 p.m. to midnight—from the day room camera in P-Pod on May 8, 2019. ECF No. 181-11 ¶ 17. The video has no sound. *Id.* ¶ 19. Defendants represent that Plaintiff appears first at 18:45,[3] though it is admittedly difficult to discern which inmate is Plaintiff. *Id.* ¶ 18. Before this, multiple officers stand at the bottom of the stairs and move throughout the dayroom as other inmates are retrieving

---

[2] The file name for this video is "5-8-19 1600-2400_MCI-281 Unit P Day Room Ceiling_.avi."
[3] For purposes of this ruling, timestamps refer to the timestamps of the video evidence, as opposed to the time during the evening at issue.

meal trays and sitting at the tables in the dayroom.  *See* Video 1 at 17:45–18:30.  At 18:45, Plaintiff, whose cell is near the top of the stairs, exits his cell and goes down the stairs.  *See* Video 1 at 18:45.  He gets a meal tray, and, when he tries to bring it upstairs, officers stop him.  *Id.* 18:45–20:11.  He throws out his meal tray and goes back to his cell.  *Id.* 20:11–20:20.

Plaintiff's cell door opens at 3:55:20; another inmate is seen stopping at Plaintiff's open cell for approximately ten seconds, then the other inmate leaves and Plaintiff's cell door closes.  ECF No. 188–11 ¶¶ 21-23; Video 1 at 3:55:20–3:56:54.  Around 4:08, officers can be seen starting cell compliance checks on the upper level.  ECF No. 188-11 ¶ 24; Video 1 at 4:08:40.

At 4:12:38, Plaintiff's cell door is opened, and two officers stand at the door.  ECF No. 188-11 ¶ 25; Video 1 at 4:12:38.  One officer walks away, the remaining officer appears to motion toward a person down the corridor, and a third officer walks toward the remaining officer.  ECF No. 188-11 ¶¶ 26–27; Video 1 at 4:12:38–4:13:17.  The third officer, identified by Defendants as Defendant LaMountain, then stands at Plaintiff's cell door.  ECF No. 188-11 ¶ 27; Video 1 at 4:13:27.  Other inmates, who are on the lower level, begin to look up toward Plaintiff's cell.  ECF No. 188-11 ¶ 28; Video 1 at 4:13:40.

At 4:14:09, Officer LaMountain appears to begin to prepare to enter Plaintiff's cell.  Video 1 at 4:14:09.  A second officer walks toward Plaintiff's cell.  *Id.* at 4:14:10.  A third officer on the upper level runs toward Plaintiff's cell.  *Id.* at 4:14:13.

The three officers enter Plaintiff's cell.  *Id.* at 4:14:17.  A fourth officer runs up the stairs from the lower level five seconds later.  *Id.* at 4:14:22.  That officer, along with a fifth officer who was already on the upper level, enters Plaintiff's cell.  *Id.* at 4:14:22–26.  Two officers run into the Pod from an external door, and, after an officer motions for them to come to Plaintiff's cell, they do so.  *Id.* at 4:15:03–4:15:15.  Multiple additional officers then run into the Pod from an external

door, and some ascend the stairs towards Plaintiff's cell. *Id.* at 4:15:13–4:15:36. Several officers appear to direct the inmates on the lower level to reenter their cells, and the inmates comply. ECF No. 188-11 ¶ 30; Video 1 at 4:15:36–4:16:53.

At 4:17:01, an officer runs in from an external door, and an officer outside of Plaintiff's cell waves that officer to come to Plaintiff's cell. *Id.* at 4:17:01–4:17:12. Two other officers enter from an external door, and one enters Plaintiff's cell. *Id.* 4:17:25–4:17:31. Plaintiff is then removed from his cell at 4:18:37, and several officers escort him downstairs and out an external door. ECF No. 188-11 ¶ 31; ECF No. 188-4, 4:18:37–4:19:16.

As Plaintiff is being removed from his cell, a handheld video camera starts recording, and so begins the second video exhibit ("Video 2").[4] ECF No. 188-11 ¶ 32. The video from the handheld camera starts with Plaintiff in his cell, being restrained by two officers. Video 2 at 0:18. Plaintiff is wearing only his boxers and screaming, including "help" and "you're breaking my wrist!" *Id.* at 00:06–00:33. An officer at the door to Plaintiff's cell is explaining to the camera that Plaintiff is being restrained because he was aggressive towards officers. *Id.* at 00:26. The officers restraining Plaintiff then remove him from his cell and walk him down the stairs towards the restrictive housing unit. ECF No. 188-11 ¶ 33. Plaintiff yells that "they are beating me up, I wasn't doing nothing." Video 2 at 00:30–00:33. He says "I was sleeping. They came in my room and attacked me." *Id.* at 00:33–00:38.

Plaintiff is handcuffed; there is one officer on either side of Plaintiff, each holding one of his wrists, with Plaintiff's hands behind his back, palms facing behind him. ECF No. 188-11 ¶¶ 33, 35; Video 2 at 2:09. As Plaintiff is escorted down the stairs and led through the external door and down a hallway, he continues to state that the officers are "breaking [his] wrist," "beating

---

[4] The filename for this video is "MAC-VP-19-515-1 (MP4).mp4."

[him] up," and that they attacked him while he was sleeping and "wasn't doing anything." *Id.* at 00:40–3:08. During this walk, Plaintiff asks, "why are you bending my wrist? It hurts!" and adds, "all day you've been harassing me." *Id.* at 1:02–1:06; 1:43.

Plaintiff, speaking to one of the officers, says, "you told me to take it off and I took it off." Video 2 at 2:20. Plaintiff and the officer argue about what happened in Plaintiff's cell, with the officer saying, "you stripped down naked, and you charged the officers . . ." and Plaintiff responding, "that's not true, that's a lie . . . were you there, did you see what happened?" *Id.* at 2:21–2:36. Plaintiff says again, "I was sleeping, I wasn't doing anything." *Id.* at 2:41–2:44. He becomes increasingly agitated, saying "I stay in my cell, and I don't bother nobody, why are you doing this to me? . . . why did you attack me?" *Id.* at 3:01–3:11.

Plaintiff is then brought into an area where he is positioned with his stomach against the wall, and he continues yelling that he did not do anything and was sleeping in his room, and yells at one of the officers to stop bending his wrist because he is hurting him. *Id.* at 3:25–3:40. The officers put a spit veil on Plaintiff, as Plaintiff says, "I'm not spitting on nobody . . . You are torturing me" *Id.* at 4:03–4:10.

Officers then strip search Plaintiff, and Plaintiff repeatedly yells "stop bending my wrist" with increasing urgency. *Id.* at 4:24–4:29. Plaintiff screams "he's hurting me" as the officers pull Plaintiff toward the ground. *Id.* at 4:29–4:44. The officers then dress Plaintiff as he continues to scream, this time specifying "Gardiner, stop bending my wrist," and "you're hurting me, Gardiner!" ECF No. 188-11 ¶ 38; Video 2 at 4:46–5:00. (It is not clear from the video which officer is Gardiner.) Plaintiff is then dressed in a red prison uniform, and an officer responds to Plaintiff's complaints by stating that "nobody is bending your wrist." Video 2 at 5:26–5:44. Plaintiff is eventually led into a cell, and the officers leave and shut the door. Video 2 at 8:25–

6

8:53.  Then officers reenter the cell, and Plaintiff says "Gardiner, you are an evil man, kicking me and choking me and bending my wrist.  For what, what did I do to you?"  *Id.* at 9:14–9:25.  The officers leave Plaintiff's cell again, and they remove his handcuffs through the door.  *Id.* at 9:29–10:12.

At the end of the video, Lieutenant Bosque speaks to the camera, saying that Plaintiff "became very agitated, started screaming at the officers, and started getting undressed."  *Id.* at 10:25–10:31.  Bosque adds that an officer went inside his cell to "get him restrained" and "to try to calm him down," and Plaintiff "started fighting back."  *Id.* at 10:32–10:38.  Bosque says a signal 11 call was made, and Plaintiff was restrained.  *Id.* at 10:38–10:44.

On May 9, 2019, Plaintiff was transferred from MacDougall-Walker CI to Northern Correctional Institution ("Northern CI").  ECF No. 215 ¶ 2.

B.  Medical Visits

Medical records indicate that Plaintiff was seen by various medical providers at MacDougall-Walker CI, both before and after the May 8 incident, and at Northern CI after he was transferred.

Two reports of medical examinations in January 2019 reflect that Plaintiff suffered a past head injury and regularly experiences headaches. ECF No. 188-11 ¶¶ 49, 51.  In March of 2019, Plaintiff filed an inmate request form reporting headaches, dizziness, nausea and inability to sleep. *Id.* ¶ 53; ECF No. 189 at 9.

Shortly after the incident on May 8, Plaintiff was evaluated by Defendant Nurse Burns, who noted scratches to Plaintiff's knee and back and a cut on his right thumb, and treated the thumb wound.  *Id.* ¶¶ 14, 56.  Defendants also contend that Plaintiff was seen by mental health staff, which Plaintiff denies.  *Id.* ¶ 15; ECF No. 215 ¶ 15.

The third video ("Video 3")[5] starts with an officer noting the date is May 9, 2019, at 6:05 p.m. (the day after the incident).  The video shows Plaintiff sitting in a cell wearing a  "safety gown," while an officer explains that a controlled search was completed, and contraband—a copper wire—was found in Plaintiff's beard.  ECF No. 188-11 ¶ 41; Video 3 at 00:00–00:40.  The officer says Plaintiff will be escorted to the medical unit, where the wire will be removed.  Video 3 at 00:40–00:56.  Two officers escort Plaintiff, who is restrained and appears calm, but appears to be limping, from the cell to the medical exam room.  *Id.* at 00:56–4:19.

 In the exam room, a nurse examines Plaintiff.  ECF No. 188-11 ¶ 42; Video 3 at 5:00–7:20.  She takes Plaintiff's blood pressure and temperature and asks questions about his mental health concerns, which he answers.  Video 3 at 5:00–6:15.  The medical professional informs Plaintiff he will stay in the same unit until psychologist can see him.  *Id.* at 6:15–6:25.  Plaintiff raises concerns with her about his cell conditions and not having his eyeglasses, and she tells him he can address those the next day after the psychologist evaluates him.  ECF No. 188-11 ¶ 43; Video 3 at 6:20–7:15.

The medical professional and officers then discuss how to go about removing the copper wire from  Plaintiff's beard; Plaintiff also speaks, but it is unclear what he says.    ECF No. 188-11 ¶ 44; Video 3 at  7:15–7:48.  The officer then addresses the camera, noting that Plaintiff was found to have contraband in his beard, and the medical professional is going to remove the contraband.  Video 3 at 7:50–8:15.  The officer takes photos of Plaintiff's beard.  ECF No. 188-11 ¶ 45; Video 3 at 8:26–8:58.  The medical professional then assesses where to cut Plaintiff's beard, and Plaintiff gives his consent to cut his beard.  ECF No. 188-11 ¶ 47; Video 3 at 9:05–10:24.  The medical professional then cuts his beard.  Video 3 at 10:24–10:47.  The officer then takes photos

---

[5] The filename of this video is "MAH00385.MP4."

after Plaintiff's beard is cut. ECF No. 188-11 ¶ 45; Video 3 at 10:55–11:18. Plaintiff is then moved back to the cell, and his handcuffs are removed through the door. Video 3 at 11:32–13:50. There is a blanket visible on the bed in Plaintiff's cell. *Id.* at 12:47-12:49. The officers then end the video.

Also on May 9, Plaintiff was seen by a nurse, ECF No. 189 at 16, and supervising psychologist Dr. Coleman, *id.* at 17–23. Based on Dr. Coleman's assessment that Plaintiff posed a risk of self-harm, Defendant Dr. Zahedi, a mental health physician, ordered that Plaintiff be placed on Behavioral Observation Status ("BOS") or "suicide watch." ECF No. 188-11 ¶ 96; Zahedi Decl., ECF No. 188-8 ¶¶ 8–9. Dr. Zahedi did not personally examine Plaintiff and was not assigned to Northern CI during the time Plaintiff was on BOS. ECF No. 188-11 ¶ 98; ECF No. 188-8 ¶ 7.

C. Disciplinary Proceedings

In the days following the May 8 incident, Plaintiff received a disciplinary report for assault on a DOC employee (Defendant Andreas). ECF No. 188-11 ¶ 102. Defendants state that, on May 21, 2019, Plaintiff verbally declined the use of an advisor and witness testimony during this hearing. *Id.* ¶ 104. Plaintiff denies that he declined the use of either an advisor or witnesses. ECF No. 215 ¶ 104.

After two continuances, Plaintiff had a disciplinary hearing on the report on June 20, 2019. ECF No. 188-11 ¶¶ 102–103. Defendant Leone was the disciplinary investigator. ECF No. 188-6 at 36–42. Plaintiff attended the hearing and provided a fourteen-page statement. ECF No. 188-11 ¶ 105. He decided that he would like to have use of an advisor and witness testimony, and Defendants submit he was provided with both at the hearing. *Id.* ¶¶ 106–107. Defendants state Plaintiff was given time to review the documents with his advisor before the hearing commenced,

9

but Plaintiff maintains he was not provided the documents 24 hours in advance of the hearing, as required by DOC's Administrative Directives. *Id.* ¶ 107; ECF No. 215 ¶ 107.

Plaintiff was found guilty of the disciplinary infraction based on the video evidence, statements from officers, photographs of Defendant Andreas's injuries, and Plaintiff's acknowledgment that Defendant Andreas may have been struck. ECF No. 188-11 ¶ 108. Plaintiff states that the pictures shown to him did not reveal any injuries, that no video was reviewed, and that during the hearing he denied ever striking the officer. ECF No. 215 ¶ 108. Plaintiff received written notice of this determination on June 24, 2019. ECF No. 188-11 ¶ 109.

For the same offense, Plaintiff also received an administrative segregation report, which resulted in a hearing on June 3, 2019. *Id.* ¶ 110. Plaintiff signed the Notification of Hearing on May 23, 2019, and Plaintiff provided a handwritten statement at the hearing. *Id.* ¶ 111–112. The hearing officer recommended Plaintiff's placement in administrative segregation. *Id.* ¶ 113–114. Plaintiff was provided with notification of the decision thereafter. *Id.* ¶ 114.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might "affect the outcome of the [law]suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan*

*v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial." *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001). "It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

To defeat summary judgment, the non-moving party must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal citation and quotation marks omitted). If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which

11

[they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323; s*ee PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*per curiam*).

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (internal citation and quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Moreover, the Court bears in mind that a *pro se* litigant's filings must be liberally construed to raise the strongest arguments they suggest. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *see also Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (collecting cases regarding the "special solicitude" afforded to *pro se* litigants).

## III. DISCUSSION

The Court concludes that Defendants are entitled to summary judgment on all of Plaintiff's claims except his First Amendment retaliation claim against Defendant Gardiner and his Eighth Amendment excessive force and failure to intervene claims against several Defendants.

### A. First Amendment Retaliation Claim Against Officer Gardiner

#### 1. *Exhaustion of Administrative Remedies*

First, the Court finds that there are genuine disputes of fact concerning whether Plaintiff failed to exhaust his administrative remedies as to his First Amendment retaliation claim against Officer Gardiner.

12

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal lawsuit to exhaust available administrative remedies before a court may hear his case. *See* 42 U.S.C. § 1997e(a) (providing that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Ross v. Blake*, 578 U.S. 632, 635 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Prisoners "cannot satisfy the PLRA's exhaustion requirement solely by . . . making informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see also Day v. Chaplin*, 354 F. App'x 472, 474 (2d Cir. 2009) (summary order) (affirming grant of summary judgment for failure to exhaust administrative remedies and stating that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures"). The PLRA requires "proper exhaustion"; the incarcerated individual must use all steps required by the administrative review process applicable to the institution in which he is confined and do so properly. *Jones v. Bock*, 549 U.S. 199, 217–18 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the agency holds out, and doing so properly") (quoting *Woodford*, 548 U.S. at 90). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). The exhaustion requirement serves "two main purposes." *Woodford*, 548 U.S. at 89. First, it gives an

13

agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Id.* (cleaned up). Second, exhaustion promotes efficiency because "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.*

An individual's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable. *See Ross*, 578 U.S. at 642. "[A]n inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (internal quotation marks and citation omitted). The *Ross* court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 643–44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. The Second Circuit has said "the three circumstances discussed in *Ross* do not appear to be exhaustive." *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016).

Exhaustion of administrative remedies is an affirmative defense, *Perttu v. Richards*, 605 U.S. 460, 469 (2025), and the defendant bears the burden of proof, *see Jones*, 549 U.S. at 216. Once the defendant provides reliable evidence that administrative remedies were not exhausted before the plaintiff commenced the action, the plaintiff must present evidence showing that he did

14

exhaust his administrative remedies or establish that administrative remedy procedures were not available to him. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013). Under the PLRA, a plaintiff is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration, which can be decided through an evidentiary hearing if necessary. *Messa v. Goord,* 652 F.3d 305, 308–09 (2d Cir. 2011) ("Matters of judicial administration often require district judges to decide factual disputes that are not bound up with the merits of the underlying dispute.")).

The DOC requires inmates to submit grievances in accordance with Administrative Directive 9.6 ("AD 9.6"), which provides procedural rules and deadlines for processing general inmate requests. *Riles v. Buchanan*, 656 F. App'x 577, 579 (2d Cir. 2016). Defendants have submitted the version of A.D. 9.6 in effect in 2019. Acus Decl., Ex. A, ECF No. 188-6. A.D. 9.6 details the procedures an inmate must follow to successfully exhaust his claims, which include first seeking informal resolution verbally, *see* ECF No. 188-6 at 13; then, if the inmate is not satisfied with the informal resolution offered, submitting a CN9602 Inmate Administrative Remedy Form attaching a CN 9601 Inmate Request Form containing the appropriate staff member's response, *id.* at 14 ("Level 1"); then appealing the Level 1 disposition to Level 2 within five calendar days of receipt of the Level 1 decision, *id.* at 15; and, finally, appealing a Level 2 disposition to Level 3, within five calendar days of the receipt of the Level 2 disposition, if the grievance challenges DOC level policy or the integrity of the grievance procedure, or if the inmate has not received a timely response to the Level 2 grievance, *id.* at 15.

Defendants also submitted Plaintiff's grievances and inmate appeals to the record. Acus Decl., Ex. B, ECF No. 188-6 at 24–107. Defendants contend that these materials do not include any grievances related to a First Amendment retaliation claim against Defendant Gardiner, which

15

would suggest that he was involved in the altercation with Plaintiff on May 8, 2019, in retaliation for Plaintiff's prior exercise of First Amendment protected activity.  Defendants' materials include the following:

- Plaintiff's fourteen-page statement of facts in response to the disciplinary report, in which Plaintiff states Gardiner threatened and harassed Plaintiff on April 30, 2019, and that whenever Gardiner "works in P-unit, [Plaintiff] is purposely not let out for medication during his recreation time."  *See* ECF No. 188-6 at 47.  Later in the same statement, Plaintiff suggests that Gardiner had a motive to "lie, retaliate, and assault" Plaintiff and came into his cell on May 8 to assault and injure him because Plaintiff had "voiced his protest and complaint" against Gardiner for failing to open Plaintiff's cell door at medication time on April 30.  *Id.* at 51.

- A Level 2/3 grievance dated August 15, 2019, (IGP number "to be assigned") that Plaintiff submitted related to his placement in administrative segregation.  *Id.* at 69–70.  Plaintiff references that his advisor for the hearing failed to obtain a copy of the grievance log showing that "the assault and false charges suffered by [Plaintiff] were due to retaliation for filing such a grievance."  *Id.* at 70; *see also* ECF No. 208 at 104.  The submission does not reference Gardiner by name.

- A Levels 2/3 Grievance dated August 8, 2019, (IGP number 137-19-358) appealing a denial of a grievance related to "staff misconduct" on May 8, 2019.  *See* ECF No. 188-6 at 77–78.  Neither Gardiner nor retaliation are mentioned in this grievance or the related materials.

- A Levels 2/3 Grievance dated July 29, 2019, (IGP number "see grievance log") appealing denial of a grievance related to the alleged May 8, 2019, assault.  *See id.* at 81–82.  Neither Gardiner nor retaliation are mentioned in this grievance or the related materials.

- A Levels 2/3 Grievance dated August 15, 2019, (IGP number 141-19-317) appealing alleged failures by Defendant Leone to supply Plaintiff with materials relevant to his disciplinary report.  *See id.* at 100.  Neither Gardiner nor retaliation are mentioned in this grievance or the related materials.

In addition to Defendants' materials, Plaintiff has provided a Levels 2/3 Grievance dated August 26, 2019, (IGP number 137-20-019) related to preservation of video evidence from the May 8 incident (and the alleged April 30 incident), in which Plaintiff claimed that the video would "show a pattern of harassment and retaliation by officers involved," without mentioning any specific officers.  ECF No. 208 at 106–07.  Plaintiff has also supplied an Inmate Request Form

16

submitted on June 26, 2019, in which he suggested that Gardiner frequently would not let him out of his cell for his medication, including on April 30, 2019, and that Gardiner and Bosque were "retaliating against" Plaintiff "for filing complaints against them." *Id.* at 79–86; *see specifically id.* at 85. Finally, in an Inmate Request Form dated August 15, 2019, Plaintiff stated that the officers involved in the May 8 incident, including Officer Gardiner, "beat[] and assault[ed] me inside of my single cell . . . on May 8, 2019 in retaliation for me filing prior complaints against them." ECF No. 208 at 38. The resulting response from the MacDougall-Walker warden's office on August 22, 2019, was that "the video has been reviewed." *Id.*

From the submissions of the parties, it is clear that Plaintiff raised the issue of Gardiner's alleged retaliation against him in several different submissions—including submissions related to the alleged assault itself, video preservation of the events of May 8, his placement in administrative segregation, and his statement in connection with the disciplinary hearing. It is also clear that Defendants' submissions of Plaintiff's grievances are not fully comprehensive, as Plaintiff has included materials that Defendants did not submit. *See, e.g.*, ECF No. No. 208 at 106–07 (Levels 2/3 Grievance Form dated August 26, 2019 (IGP Number 137-20-019) and marked received on September 9, 2019, referencing that video would "show a pattern of harassment and retaliation by" the officers involved in the May 8 alleged assault); ECF No. 208 at 38 (August 15, 2019, Inmate Request Form stamped as received on August 22, 2019, referencing the Gardiner and other officers assaulted Plaintiff in retaliation for his filing prior complaints against them).

Based on the record before the Court, it cannot conclusively determine that Plaintiff failed to exhaust his administrative remedies related to Defendant Gardiner's alleged retaliation. In particular, IGP Number 137-20-019 submitted by Plaintiff, which was fully exhausted, creates a genuine dispute of fact as to whether prison officials were on notice that Plaintiff was alleging the

17

May 8 incident was a retaliatory act by the officers involved, including Gardiner. ECF No. 208 at 106–07. Thus, the Court cannot find that Gardiner is entitled to summary judgment on Plaintiff's retaliation claim on the basis of failure to exhaust administrative remedies. Should Defendants wish to pursue this issue, the Court will convene an evidentiary hearing on the matter. *See Messa,* 652 F.3d at 308–09.

### 2. Merits of First Amendment Retaliation Claim

The Court also concludes that there is a genuine dispute of material fact concerning whether Defendant Gardiner's actions on May 8, 2019, were taken in retaliation for Plaintiff's engagement in First Amendment protected activity.

To establish a First Amendment retaliation claim, a plaintiff must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). The Second Circuit has "instructed district courts to 'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)).

Plaintiff's retaliation claim against Gardiner appears based on Plaintiff's apparent "protest and complaint" to Gardiner when Gardiner failed to open Plaintiff's cell so that he could obtain medication on April 30, 2019, and prior complaints Plaintiff filed against Gardiner. *See* ECF No. 50 at 13 (describing Gardiner's failure to open the door on April 30, and actions on May 8, as

18

retaliatory); ECF No. 188-6 at 51 (describing Gardiner refusing to open Plaintiff's cell door on April 30); ECF No. 208 at 138 (grievance dated April 30, 2019, describing Gardiner's failure to open Plaintiff's cell door so he could receive medication and allegedly bullying and threatening Plaintiff); ECF No. 208 at 38 (grievance dated August 15, 2019, referencing "prior complaints" filed against Gardiner). Defendants do not contest that Plaintiff engaged in protected First Amendment activity by filing grievances. *See* ECF No. 188-1 at 17.[6] Additionally, the alleged assault(s) on May 8 qualify as adverse actions, as assault(s) would certainly deter similarly situated individuals of ordinary firmness from exercising their constitutional rights. *See Brandon*, 938 F.3d at 40 ("An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'") (quoting *Davis*, 320 F.3d at 353).

And there is at least a genuine dispute of material fact with respect to causation. Temporal proximity between the protected activity and the adverse action can help prove causation. *See Bennett v. Goord*, 343 F.3d 133, 138 (2d Cir. 2003). Here, Plaintiff alleges that Gardiner failed to open his cell door on April 30, 2019, and the record reflects he complained about Gardiner's actions by filing a grievance that very day. *See* ECF No. 208 at 138. Merely eight days later, Gardiner was allegedly involved in using excessive force with Plaintiff. On this record, a reasonable jury could conclude that Plaintiff's protected activity (the grievance) was a "but-for" cause of Gardiner's allegedly retaliatory actions. *See Nieves v. Bartlett*, 587 U.S. 391, 399 (2019) (finding that causation in a First Amendment retaliation claim "must be a 'but-for' cause, meaning

---

[6] Plaintiff does not suggest he filed a complaint in any court complaining of Gardiner's conduct on April 30, 2019. But he has submitted an Inmate Request Form dated April 30, 2019, addressed to the "Unit Administrator" that complains of Gardiner's conduct of failing to open Plaintiff's cell door so that he could receive medication on that day. ECF No. 208 at 138. Plaintiff stated in that form that Gardiner "threaten[ed] to beat up, to sexually assault and attack [Plaintiff] for complaining about him to higher staff." *Id.* The Court construes the filing of this Inmate Request Form as protected activity. *See Davis*, 320 F.3d at 352–53 (holding that the filing of prison grievances is a constitutionally protected activity).

that the adverse action against the plaintiff would not have been taken absent the retaliatory motive"). Whether Gardiner actually acted with retaliatory animus will turn, at least in part, on assessments of Plaintiff's and Gardiner's credibility, which are properly reserved for the jury. *See Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) ("Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.").

Additionally, these genuine factual disputes preclude a finding that Defendant Gardiner is entitled to qualified immunity at this juncture. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). There are therefore two steps to the qualified immunity analysis: first, whether the plaintiff established that his constitutional rights were violated, and second, whether the right at issue was "clearly established" at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Defendants bear the burden of showing that they are entitled to qualified immunity. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

In the qualified immunity context, "[p]re-trial resolution of the defense [of qualified immunity] . . . may be thwarted by a factual dispute." *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990). And "'[a]ny disputed questions of material fact—such as the acts of the defendant and their effects on the plaintiff—are to be determined by the factfinder.'" *Eaton v. Estabrook*, 144 F.4th 80, 89–90 (2d Cir. 2025) (quoting *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022)). Here, there are sufficient questions of fact relating to whether Gardiner's alleged actions on May 8 were taken

in retaliation for Plaintiff's complaints about him that the Court cannot conclude, on summary judgment, that he is entitled to qualified immunity.

Thus, Defendant Gardiner is not entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

B. Eighth Amendment Excessive Force and Failure to Intervene Claims

As to Plaintiff's Eighth Amendment claims, too, there are questions of fact that preclude entry of summary judgment.

Plaintiff claims that various Defendants used excessive force during the May 8, 2019, incident, and that other Defendants failed to intervene during that excessive force. The Eighth Amendment proscribes correctional officers from applying force "maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (internal quotation marks and citation omitted); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). A successful Eighth Amendment claim must show both an objective element and a subjective element. Objectively, the conduct complained of must be "sufficiently serious" to constitute a constitutional violation. *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (quoting *Hudson*, 503 U.S. at 8, 20 (internal quotation marks omitted)). The objective element "depends upon the claim at issue." *Id.* (quoting *Hudson*, 503 U.S. at 8 (internal quotation marks omitted)). The subjective element requires that the prison official "acted with a subjectively 'sufficiently culpable state of mind.'" *Id.* (quoting *Hudson*, 503 U.S. at 8). The "core inquiry in making such a determination 'is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Jones v. Baran*, 798 F. Supp. 3d 197, 213 (D. Conn. 2025) (quoting *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016)).

### 1. Defendant Gardiner

The Court finds that there is a genuine issue of material fact as to whether Defendant Gardiner used excessive force in subduing Plaintiff on May 8, 2019.

Despite Defendants' contrary view of the record, many of the circumstances surrounding the incident in Plaintiff's cell are unknown. For example, although there is video evidence of the event, the video does not show the inside of Plaintiff's cell while force was used, and thus the extent of the force and whether Plaintiff resisted commands is unknown.

And although Defendants have submitted witness statements corroborating that Plaintiff resisted and thus his apprehension required force, the record also shows that Plaintiff, in being transported from his cell, yelled otherwise. In the video, Plaintiff, speaking to one of the officers, says, "you told me to take it off and I took it off." Video 2 at 2:20. This statement arguably supports Plaintiff's compliance. And when the officer says, "you stripped down naked, and you charged the officers . . . " Plaintiff responds, "that's not true, that's a lie." *Id.* at 2:21–2:34. Plaintiff says again, "that's not true, I was sleeping, I wasn't doing anything." *Id.* at 2:37–2:48. He becomes increasingly agitated, saying "I stay in my cell, and I don't bother nobody, why are you doing this to me? . . . why did you attack me?" *Id.* at 3:01–3:11. Moreover, specific to Defendant Gardiner, Plaintiff says, "Gardiner, you are an evil man, kicking me and choking me and bending my wrist. For what, what did I do to you?" *Id.* at 9:14–9:25. In the aftermath of the incident, Plaintiff's documented injuries included scratches on his knee, back, and elbow, as well as a cut to his thumb. ECF No. 215 ¶¶ 56–57. And while Plaintiff was being escorted to the RHU and restrained in connection with the strip search, he continually screamed in pain, as evidenced by the video.

The Court concludes that Plaintiff's statements immediately after the encounter, during the escort to RHU, and around the time of the strip search, are sufficient evidence to create a genuine

22

issue of material fact as to whether Defendant Gardiner used excessive force. On this record, a reasonable fact finder could conclude that Defendant Gardiner used excessive force against Plaintiff during the incident in a manner that was malicious and sadistic, as opposed to directed at a good faith effort to restore discipline. Thus, summary judgment is inappropriate on the merits of Plaintiff's Eighth Amendment excessive force claim against Gardiner. *See Baran*, 798 F. Supp. 3d at 216.

Given the material factual disputes identified above concerning the degree of force used to subdue Plaintiff, whether Plaintiff resisted, and whether the force was employed for a legitimate penological purpose or instead for a malicious purpose, Defendant Gardiner is not entitled to qualified immunity at this point. The Court cannot say as a matter of law that it was objectively reasonable for Defendant Gardiner to believe that his actions were lawful at the time of the encounter. *See Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (describing that officers will be entitled to qualified immunity if it was "objectively reasonable for them to believe their acts did not violate" the plaintiff's rights) (citation omitted). Thus, qualified immunity is denied at this time as to Defendant Gardiner regarding Plaintiff's excessive force claim.

### 2. *Failure to Intervene Claim against Officer LaMountain, Lieutenant Bosque, Officer Andreas, Lieutenant Mihaliak, Officer O'Neil, and Officer Yohe*

The Court also denies summary judgment with respect to Plaintiff's claims against the remaining officers, which ostensibly focus on their failure to intervene.[7]

Officers "have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v.*

---

[7] While Plaintiff was being escorted to the RHU and in the time before and during his strip search, there was one officer on each side of him, each holding one of his wrists. The Court assumes that one of these officers was Gardiner, based on Plaintiff's comments during the video. It is unclear to the Court who the second officer is. That officer may be liable for a direct Eighth Amendment violation, in addition to failure to intervene in Gardiner's alleged used of excessive force, for the reasons explained above with respect to Defendant Gardiner.

*Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citing cases). To state a Section 1983 claim for failure to intervene in another officer's constitutional violations, a plaintiff must allege that (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable steps to intervene. *Jackson v. City of N.Y.*, 939 F. Supp. 2d 219, 231–32 (E.D.N.Y. 2013); *see also O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988).

First, with respect to the arguments of Defendants Yohe and O'Neil that they lacked personal involvement in the alleged constitutional violation, the Court concludes that neither of these Defendants is entitled to summary judgment on this basis. It is true that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Spavone v. N.Y. State Dept. of Correctional Services,* 719 F.3d 127, 135 (2d Cir. 2013). Defendants have submitted a use of force report prepared by Yohe stating that Yohe was assigned to the RHU on May 8, 2019, and simply assisted in the controlled strip search of Plaintiff after Plaintiff was brought to the RHU. *See* ECF No. 188-11 ¶ 12; ECF No. 188-3 at 26. But the video evidence demonstrates that Plaintiff was screaming about being in pain from his wrist being bent in Yohe's presence, from the time Yohe arrived to conduct the strip search until at least when Plaintiff was locked in the RHU cell. *See* Video 2 at 4:40–8:45. Yohe's name is visible on his uniform in Video 2 at 7:38, while Plaintiff is yelling in pain. Although Yohe may not have participated directly in the alleged excessive force related to the bending of Plaintiff's wrist, the video shows that he would have had a realistic opportunity to intervene in the other officers' use of force while Plaintiff screamed in pain. Likewise, Defendant O'Neil, as camera operator during the period of time when Plaintiff was screaming in pain, was personally involved in the alleged failure to intervene, insofar as he witnessed the events and had a realistic opportunity

24

to intervene. Thus, both of these Defendants had sufficient personal involvement in the alleged failure to intervene that summary judgment is unwarranted on this basis.

More generally, with respect to Defendants LaMountain, Bosque, Andreas, Mihaliak, O'Neil, and Yohe, the Court is unable to discern who is who in the videos, including Video 2, with the exception of Defendants Yohe (as previously described) and Bosque, whose name is visible on his uniform in Video 2 at 10:28–10:51. As to what occurred in Plaintiff's cell, the video evidence does not show what occurred, and thus the Court cannot conclude that these Defendants are entitled to judgment as a matter of law. Resolution of what occurred in Plaintiff's cell will turn on the credibility of the officers and Plaintiff—a matter reserved for the jury. *See Baran*, 798 F. Supp. 3d at 216 (holding the same where video evidence was inconclusive); *Fischl*, 128 F.3d at 55. Additionally, during the majority of the interaction in Video 2, there are three officers besides Yohe who would have had a realistic opportunity to intervene in any alleged excessive use of force by Gardiner or the other officer holding Plaintiff's other wrist. This includes Defendant Bosque— identifiable based on his name tag shown at the end of Video 2—who appears to direct the other officers as they restrain, search, and dress Plaintiff. But as Defendants have not put forward any evidence of who the remaining officers are (or are not), and as a reasonable jury could conclude that these officers had a realistic opportunity to intervene in the alleged excessive force and did not, the Court cannot conclude that they are entitled to summary judgment.

As noted above with respect to the Eighth Amendment claim against Defendant Gardiner, these factual disputes likewise preclude a finding that Defendants LaMountain, Bosque, Andreas, Mihaliak, O'Neil, and Yohe are entitled to qualified immunity.

C. Eighth Amendment Deliberate Indifference to Medical Needs Claim against Nurse Burns

Plaintiff also alleges that Defendant Nurse Burns—the medical professional who examined him after the incident—violated his Eighth Amendment rights by failing to "properly assess, treat, or give follow up care" after the incident on May 8, 2019.  Am. Compl., ECF No. 50 ¶ 15. Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to his claim against Defendant Burns.  The Court agrees, and grants summary judgment on this claim. The claim also fails on the merits.

### 1.  Exhaustion of Administrative Remedies

While the general principles of exhaustion discussed above apply, claims related to health and medical issues also follow the procedure dictated in Administrative Directive 8.9 ("A.D. 8.9"), meaning that putative plaintiffs must file Health Services Reviews ("HSRs") to exhaust their claims.  *See* Jackson Decl., ECF No. 188-7, ¶¶ 4, 10.  Defendants included the relevant version of A.D. 8.9 in the record.  *Id.* at 6–10.  Plaintiff's claim against Defendant Burns relates to what he argues was deficient treatment in the wake of the May 8, 2019, incident in his cell.

However, none of Plaintiff's HSRs relates to Defendant Burns and her medical treatment. On June 5, 2019, Plaintiff submitted a HSAR objecting to the perceived failure of staff to take "remedial effective action" to hold the Defendant officers accountable for their actions on May 8, 2019.  ECF No. 208 at 70.  Specifically, he stated he reported the incident to various staff, including calling PREA hotlines, but "medical and mental health staff" had not taken action.  *Id.*  On June 23, 2019, Plaintiff submitted a HSR requesting medical attention for medical issues including headaches, nausea, and a "neurological condition which is impairing [his] daily functions."  ECF No. 188-7 at 13.  He requested to see a neurologist and an ear, nose, and throat specialist.  *Id.*  He does not mention Defendant Burns in this HSR or complain specifically about care that he received

26

from someone in her role; nor does he specifically link his medical issues to the events of May 8, 2019. Rather, Plaintiff's June 23 HSR reports symptoms ongoing for "months" and similar in nature to those he had reported several months before the May 8 incident. *See id.*; ECF No. 189 at 9 (reporting dizziness and nausea and requesting to see a neurologist). A subsequent HSR dated July 29, 2019, refers only to Defendant Dr. Zahedi. *Id.* at 15.

Plaintiff argues that he failed to submit an HSR related to Defendant Burns because he learned information relevant to his claim only through discovery in this case. ECF No. 211 at 7. But Plaintiff's Eighth Amendment deliberate indifference claim is rooted in the allegedly insufficient medical care he received from Defendant Burns on May 8, 2019, which he would have known about shortly after the treatment occurred. And A.D. 8.9 does not require that a plaintiff specify the name of the provider involved; instead, a plaintiff need only "provide a concise statement of what particular diagnostic or treatment decision he/she believes to be wrong and how he/she has been affected." A.D. 8.9(11).

Plaintiff's June 5 and June 23 HSRs are simply too general to have put the prison on notice of his Eighth Amendment claim against Defendant Burns. To properly exhaust a claim, "a prisoner must allege facts sufficient to alert corrections officials to the nature of the claim, and provide enough information about the conduct at issue to allow prison officials to take appropriate responsive measures." *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012) (summary order) (internal quotations omitted). If a plaintiff does not provide such description or notice, correctional officials are not afforded the "opportunity to address complaints internally," which Congress has required before a plaintiff can pursue a federal case. *Porter*, 534 U.S. at 525. Although a plaintiff "need not specifically articulate his claims in grievances in the exact same manner that he articulates them in federal court, he is required to give notice to the defendants about the factual

27

basis of his claims." *Edwards v. Melendez*, 832 F. App'x 50, 54 (2d Cir. 2020) (summary order); *Demuth v. White*, No. 9:18-CV-915, 2020 WL 1030649, at *4 (N.D.N.Y. Mar. 3, 2020) (a plaintiff's claim may be unexhausted when the plaintiff "fails to fairly raise [his] claims in his grievances").

Here, the Court cannot conclude that the HSRs submitted by Plaintiff would have put the prison on notice of any issue related to Nurse Burns' medical care after the May 8, 2019, incident. They are simply too general to have served the purpose of exhaustion:  allowing the prison to investigate and address the claim on its own.  Thus, the Court concludes that there is no genuine dispute of material fact that Plaintiff failed to exhaust his administrative remedies as to the Eighth Amendment claim against Defendant Burns, and she is entitled to summary judgment on this claim.

### 2.  Merits of Eighth Amendment Deliberate Indifference Claim

Even if Plaintiff had exhausted administrative remedies related to Nurse Burns' care of him, however, his Eighth Amendment claim against her would fail on the merits.

"The Eighth Amendment prohibits the infliction of 'cruel and unusual punishments.'"  *Walker*, 717 F.3d at 125 (quoting U.S. Const. amend. VIII).  "Under the Eighth Amendment, States must not deprive prisoners of their 'basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety.'"  *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (*per curiam*) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). "Although the Constitution does not require 'comfortable' prison conditions, the conditions of confinement may not 'involve the wanton and unnecessary infliction of pain.'"  *Walker*, 717 F.3d at 125 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  To sufficiently state a claim for inadequate medical care, Plaintiff must present evidence "showing the offending official's

'deliberate indifference to [his] serious medical needs.'" *Thomas v. Wolf*, 832 F. App'x 90, 92 (2d Cir. 2020) (summary order) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). The standard of deliberate indifference to inmate health or safety includes both subjective and objective components. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

The first component is objective, requiring the prisoner to demonstrate that the alleged deprivation of medical care was "'sufficiently serious.'" *Id.* (quoting *Wilson,* 501 U.S. at 298). The prisoner must "show that he was 'actually deprived of adequate medical care' by an official's failure 'to take reasonable measures in response to a [sufficiently serious] medical condition.'" *Thomas*, 832 F. App'x at 92 (brackets in original) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006), *abrogated on other grounds as recognized by Kravitz v. Purcell*, 87 F.4th 111, 119, 122 (2d Cir. 2023)). Several factors are relevant to the inquiry of the seriousness of a medical condition, including whether a reasonable doctor or patient would find it important and worthy of comment; whether the condition significantly affects an individual's daily activities; and whether it causes chronic and substantial pain. *Salahuddin*, 467 F.3d at 280. Courts also consider whether the denial of treatment results in further significant injury or the unnecessary and wanton infliction of pain. *See Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000).

With respect to the subjective component, "[a]n official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety,'" which is "a state of mind 'equivalent to the familiar standard of recklessness' as used in criminal law." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d. Cir. 2003) (*quoting Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998), and then *Phelps*, 308 F.3d at 186). Conduct may rise to the level of deliberate indifference when the prison official's act or failure to act "evinces 'a conscious disregard of a substantial risk of serious harm.'" *Hathaway v. Coughlin*, 99 F.3d 550,

29

553 (2d Cir. 1996) (quoting *Farmer*, 511 U.S. at 839). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Here, the record demonstrates that Defendant Burns was not deliberately indifferent to Plaintiff's medical needs. First, there is insufficient evidence from which a reasonable jury could conclude that Plaintiff's medical condition would be considered sufficiently serious to meet the objective component of an Eighth Amendment deliberate indifference claim. Plaintiff's complaint had alleged that he suffered sore ribs, a broken tooth, cuts, bruises, painful and sore wrists, bloody stool, an injured thumb, and a "torn beard." ECF No. 50 at 17, ¶ 15. When Plaintiff was taken to the RHU on May 8, 2019, Defendant Burns conducted a medical assessment and noted only that he had scratches on his left knee and back, and a superficial cut on his right thumb. Med. Records, ECF No. 189 at 13–14.[8] Although Burns commented on these issues, there is nothing in the record to suggest that they were of a degree that they would significantly impair Plaintiff's daily activities or cause him chronic and substantial pain. *See Young v. Choinski*, 15 F. Supp. 3d 172, 183–84 (D. Conn. 2014) (collecting cases relating to scratches and abrasions).

Plaintiff's allegation that Burns purposefully understated the extent of his injuries, ECF No. 50 ¶ 15, is mere speculation, unsupported by anything in the record.[9] There is no indication that Plaintiff notified Defendant Burns about pain in his ribs on May 8; rather, the medical records

---

[8] To the extent Plaintiff objects to the admissibility of the medical records on hearsay grounds, Defendants have attached a certificate of authenticity to their reply, clarifying that the medical records submitted in ECF No. 189 qualify as business records under Federal Rule of Evidence 803(6), and therefore are not hearsay. *See* ECF No. 218-1 at 3–4. In addition, Plaintiff's statements within the medical records are admissible as non-hearsay party-opponent statements when offered by Defendants, *see* Fed. R. Evid. 801(d)(2), and are also admissible as statements made for medical diagnosis and treatment, *see* Fed. R. Evid. 803(4).

[9] A second medical record dated May 8, 2019, recounts the same injuries: "bleeding thumb from his nail, superficial scratches on elbow." ECF No. 189 at 15. It also notes that Plaintiff suffers from post-traumatic stress disorder, schizotypal personality disorder, and kleptomania, but that Plaintiff was aware of how to contact mental health providers if necessary. *Id.*

reflect Plaintiff first mentioned rib pain to a different medical provider the next day, May 9. ECF No. 189 at 16, 24. In an examination on May 11, Plaintiff winced when he received received a physical examination of his chest area, but his chest did not have any bruises or lacerations, and an x-ray taken on May 14 did not reveal any fractured ribs or pulmonary contusions. *Id.* at 33, 42–43. Likewise, Plaintiff first complained of rectal bleeding on May 13, 2019. *Id.* at 37. He was examined and treated for the bleeding by a doctor on May 14, 2019. *Id.* at 41.

Based on the dates of these complaints and examinations by other medical providers, the Court cannot conclude that Defendant Burns understated the nature and extent of his injuries when she saw him on May 8. And although the HSR that Plaintiff submitted on June 23, 2019, references medical issues that Plaintiff claims were affecting his daily functions, ECF No. 188-7 at 13, it is not specific as to what those issues are, such that a reasonable jury could conclude he suffered from sufficiently serious medical conditions when he was seen by Burns on May 8, 2019.

Even if the conditions were sufficiently serious, though, the record is devoid of evidence suggesting that Defendant Burns acted with conscious disregard for any serious medical need. During her one brief encounter with Plaintiff, she examined him, noted his scratches and the cut on his thumb, placed him on "medical treatment to thumb once a day as needed," and observed that although he had been seen by mental health staff, he continued to say he wanted to "talk to mental health." ECF No. 189 at 14. To the extent Plaintiff suggests Burns should have treated his injuries further, at most he alleges negligence or medical malpractice, which is insufficient to support an Eighth Amendment deliberate indifference claim. *See Thomas*, 832 F. App'x at 92–93 (citing *Hathaway*, 99 F.3d at 553). A patient's disagreement with the treatment he was provided does not rise to the level of deliberate indifference. *See Wright v. Rao*, 622 F. App'x 46, 47 (2d Cir. 2015) (citing *Chance*, 143 F.3d at 703)). Thus, the Court concludes there are no genuine

31

issues of material fact concerning the subjective component of the Eighth Amendment deliberate indifference to medical needs claim.

For these reasons, Defendant Burns is entitled to summary judgment on the Eighth Amendment claim. Having so concluded, the Court need not reach the qualified immunity arguments related to this claim.

D. Eighth Amendment Conditions of Confinement Claim against Dr. Zahedi

Next, the Court concludes that Defendant Dr. Zahedi is entitled to summary judgment on Plaintiff's Eighth Amendment rights related to Plaintiff's conditions of confinement.

The claim against Defendant Dr. Zahedi is specific to Plaintiff's allegations that Dr. Zahedi ordered Plaintiff to be isolated in a cold observational room without adequate clothing and blankets, without adequate nutrition, and without his prescription eyeglasses. ECF No. 50 ¶ 16; ECF No. 62 at 8–9. Defendants argue that Plaintiff has failed to show either that Dr. Zahedi had the requisite personal involvement to sustain a constitutional violation or that Dr. Zahedi violated Plaintiff's Eighth Amendment rights to be free from cruel and unusual punishment.

The evidence in this case shows that Defendant Dr. Zahedi ordered Plaintiff to be placed on BOS or "suicide watch" at Northern CI for one week beginning on May 9, 2019. ECF No. 188-7 at 14–15; ECF No. 188-8 ¶¶ 4–10. Plaintiff filed an HSAR to this effect on July 29, 2019. ECF No. 188-7 at 14–15. In this HSAR, Plaintiff writes that the BOS cell was cold, that he was left without a blanket or sufficient clothing, that he had to eat "inadequate, cold food," that he lacked access to his prescription eyeglasses, and that he was not treated for injuries suffered at MacDougall CI. *Id.* at 15. Plaintiff was not personally examined by Dr. Zahedi prior to the decision to place him on BOS. *Id.*; ECF No. 188-8 ¶ 8. Rather, a supervising psychologist contacted Dr. Zahedi after assessing Plaintiff and determining he posed a risk of self-harm. *Id.*

Based on the supervising psychologist's assessment and concerns, and following DOC policy, Dr. Zahedi agreed to place Plaintiff on BOS. *Id.* ¶ 9.

Dr. Zahedi did not personally observe the conditions of Plaintiff's cell while on BOS and was not made aware of Plaintiff's complaints until the filing of this lawsuit. ECF No. 188-8 ¶¶ 7, 10. He was not assigned to Northern CI at the time. ECF No. 188-11 ¶ 98; ECF No. 188-8 ¶ 7. Dr. Zahedi's declaration affirms that, per DOC policy, inmates on BOS are "placed in a safety cell," "covered in a protective gown," and given a blanket. ECF No. 188-8 ¶ 6. Additionally, by policy, DOC maintains possession of an inmate's eyeglasses as well as any shaving material or plastic utensils. *Id.*

Because there is evidence that Dr. Zahedi was involved in Plaintiff's placement on BOS based on his colleague's recommendation—and thus, the allegedly inadequate cell conditions— the Court cannot conclude that Dr. Zahedi lacked personal involvement in the alleged constitutional violation, and decides the issue on the merits of the constitutional violation. But on this record, the Court concludes there is no evidence from which a reasonable jury could find that Dr. Zahedi had the requisite knowledge of Plaintiff's conditions of confinement to violate Plaintiff's Eighth Amendment rights.

To succeed on an Eighth Amendment claim based on conditions of confinement, Plaintiff must show "objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities," and subjectively, that the prison official "knew of, and disregarded, an excessive risk to inmate health or safety from the challenged condition of confinement." *Edwards v. Quiros*, 986 F.3d 187, 192 (2d Cir. 2021) (cleaned up); *Farmer*, 511 U.S. at 834. Sufficiently serious conditions of confinement are ones that deprive Plaintiff of "the minimal civilized measure of life's necessities" or constitute an "unquestioned

33

and serious deprivation of basic human needs." *Id.* These needs include "food, clothing, medical care, and safe and sanitary living conditions." *Walker*, 717 F.3d at 125 (citation omitted). That said, "the Constitution does not mandate comfortable prisons," and "conditions [that] are restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981).

On this record, no reasonable factfinder could conclude that Dr. Zahedi acted with deliberate indifference to Plaintiff's health or safety. *See Farmer*, 511 U.S. at 834. First, the medical records evince that Plaintiff was seen by medical providers (not including Dr. Zahedi) during his first few days on BOS, and he did not mention any complaints related to the conditions of his cell. *See* ECF No. 189 at 24–49. Dr. Zahedi reports knowledge of DOC policies governing BOS supervision, but no evidence indicates he had personal knowledge of Plaintiff's cell conditions. ECF No. 188-8 ¶¶ 5–7. Dr. Zahedi specifically affirms that he had no knowledge of the temperature of Plaintiff's cell or the meals provided to him, as Dr. Zahedi was not assigned to Northern at the relevant time. *Id.* ¶ 7; ECF No. 188-11 ¶ 98 ("Dr. Zahedi was not assigned to the Northern facility and was not aware of any of the conditions of the cell where Plaintiff was placed"). And Plaintiff's complaint about his cell conditions was not filed until July 29, long after his time on BOS had ended. ECF No. 188-7 at 14–15. Thus, the evidence indicates that Dr. Zahedi had no personal knowledge of the specific conditions of Plaintiff's BOS confinement. Without such knowledge, Dr. Zahedi cannot be said to have known of and disregarded an excessive risk to Plaintiff's health or safety. *See Edwards*, 986 F.3d at 192.

For his part, Plaintiff argues that it should be assumed that Dr. Zahedi, based on his long tenure with the DOC, would have known that "isolation and shackling policies and practices put persons with mental illness at substantial risk of profound and lasting injury." ECF No. 211 at 17–

34

18.  Plaintiff also references a lawsuit describing inhumane conditions at Northern, including cold cells and full restraint shackling.  *Id.* at 18 (citing *State of Conn. Off. of Protection and Advocacy for Persons with Disabilities v. Choinski*, No. 3:03-CV-1352 (D. Conn. 2003).   Based on the Court's review of the docket for that action, the district court never made factual or legal findings regarding the alleged conditions at Northern; rather, the case settled and was dismissed.  *See* ECF No. 75 (order of dismissal dated September 26, 2005).  Further, Dr. Zahedi was not a defendant in that action, nor was he employed by the DOC at any point during the pendency of that lawsuit. ECF No. 188-8 ¶ 3 (noting Dr. Zahedi began working at DOC in August of 2009).  Thus, Plaintiff's arguments related to Dr. Zahedi's alleged knowledge of the general conditions at Northern in 2003 (sixteen years before the relevant events) are mere speculation, unsupported by evidence in the record.  And even if Plaintiff's argument were credited, it does not demonstrate a triable issue of fact as to whether Dr. Zahedi knew of the conditions in Plaintiff's *particular* cell during his *particular* period on BOS.  *See Hendrix v. Annucci*, No. 9:20-CV-0743 (GTS) (TWD), 2021 WL 4405977, at *13 (N.D.N.Y. Sept. 27, 2021) ("The fact that [the defendant] may have been aware of general issues regarding prison conditions and the general effect that those issues may have on inmates does not plausibly suggest that [he] had sufficient knowledge of the specific circumstances and details of Plaintiff's . . . confinement.")

Without demonstrating that Dr. Zahedi knew of the allegedly unconstitutional conditions of Plaintiff's confinement while on BOS at Northern, Plaintiff cannot show that Dr. Zahedi acted with sufficient culpable intent—that is, "knowledge that an inmate faces a substantial risk of serious harm and [] disregard[ing] that risk by failing to take reasonable measures to abate the harm." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996).  Thus, the Court

35

grants summary judgment for Defendant Dr. Zahedi on Plaintiff's claim that Dr. Zahedi violated Plaintiff's Eighth Amendment rights.

### E. Fourteenth Amendment Procedural Due Process Claims

Plaintiff advances two procedural due process claims, relating to the disciplinary hearing conducted by Defendant Leone and his administrative segregation proceedings conducted by Defendant Tugie. The Court holds that both Defendants Leone and Tugie are entitled to summary judgment on Plaintiff's Fourteenth Amendment due process claims.

#### 1. *Defendant Leone (Disciplinary Hearing)*

First, Plaintiff alleges his Fourteenth Amendment due process rights were violated during his disciplinary hearing for injuring Defendant Andreas during the May 8, 2019, encounter.[10]

A plaintiff has a right to due process if there is a risk of infringement upon a liberty interest. *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). A prisoner's liberty interest is implicated by prison discipline "only if the discipline imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Defendants do not challenge that Plaintiff's liberty interest is implicated here. The next inquiry is therefore whether there is a genuine dispute of material fact concerning whether Plaintiff's due process rights were violated.

---

[10] Defendants submit that "[d]espite Plaintiff's claims to the contrary, the State of Connecticut criminal record review indicates that he pleaded guilty to striking Defendant Andreas in this incident," ECF No. 188-1 at 27. The Court may take judicial notice of matters of public record, including docket sheets from other court actions. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006). Here, the State of Connecticut Judicial Branch website provides that Plaintiff was convicted on August 4, 2022, of breach of peace in the second degree, related to an arrest on August 21, 2019. *See State v. Stephenson*, No. H13W-CR19-0191163-S, available at https://jud2.ct.gov/crdockets/SearchByDefDisp.aspx (search for Stephenson, Joseph A.) (last visited March 31, 2026). Defendants represent that this conviction is related to Plaintiff's assault on Defendant Andreas. As the underlying facts related to this conviction are not available on the public docket and Defendants have provided no evidence to support this assertion, the Court does not consider it.

While due process protections afforded to a prison inmate charged with a disciplinary violation do not equate to "the full panoply of rights due a defendant in . . . [criminal] proceedings," *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974), an inmate is entitled to "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken," *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). The Second Circuit has emphasized that, in the context of disciplinary proceedings, "the *only* process due an inmate is that minimal process guaranteed by the Constitution, as outlined in *Wolff*." *Shakur v. Selsky*, 391 F.3d 106, 119 (2d Cir. 2004) (emphasis in original).

Plaintiff alleges that Defendant Leone, as the hearing officer, deprived him of his right to "receive and use information" to prepare an effective defense because he had not provided him with "any required materials" before the disciplinary hearing and officials "actively resisted/impeded Plaintiff's efforts to obtain such information." ECF No. 50 at 52–53.

Plaintiff had a hearing on his disciplinary report on June 20, 2019. ECF No. 215 ¶ 102. Defendants claim the hearing was continued twice for review of the video evidence, although Plaintiff claims the continuances concerned only the video synopsis. *Id.* ¶ 103. Defendants further assert that, in advance of the hearing, Plaintiff verbally declined the use of an advisor and the opportunity to present witnesses. *Id.* ¶ 104. Plaintiff disputes that he verbally declined. *Id.*

In advance of the hearing, Plaintiff submitted a fourteen-page statement. *Id.* ¶ 105. At the hearing, Plaintiff requested an advisor and the opportunity to present witnesses. *Id.* ¶ 106. Defendants submit that they provided an advisor at the hearing, as well as witness statements, which Plaintiff reviewed with his advisor before the hearing started. *Id.* ¶ 107. Plaintiff disputes

37

that he was provided with relevant reports and video evidence, and claims he should have been allowed to consult with his advisor at least twenty-four hours before his hearing. *Id.* Plaintiff was adjudicated guilty, though he disputes that the video and photographic evidence supported this outcome. *Id.* ¶ 108. Plaintiff admits he received notice of the disposition on June 24, 2019, but contends the notice was defective. *Id.* ¶ 109.

To start, as noted in Defendants' reply, in his voluminous submissions, Plaintiff does not appear to press any argument against summary judgment related to his Fourteenth Amendment claim stemming from his disciplinary hearing. *See generally* ECF No. 211. It is thus not clear whether he has abandoned this claim.

In any event, on this record the Court finds that there is no genuine dispute of material fact that Plaintiff was afforded adequate due process in his disciplinary hearing. "To satisfy *Wolff*, an inmate must receive written notice of the charges against him at least twenty-four hours prior to the hearing." *Nau v. Papoosha*, No. 3:21-CV-19 (OAW), 2025 WL 2432608, at *5 (D. Conn. Aug. 22, 2025). Here, nothing suggests that this standard was not met, especially where Plaintiff submitted a statement in advance of the hearing. ECF No. 215 ¶ 105.

As for Plaintiff's claim that he did not have adequate opportunity to review the video evidence, courts have held that "*Wolff* only demands that an inmate be *informed* of the evidence against him." *Nau*, 2025 WL 2432608, at *6 (emphasis in original) (citing *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989) ("at a minimum, a prisoner is entitled to be confronted with the accusation, informed of the evidence against him . . . and afforded a reasonable opportunity to explain his actions") (citation omitted)). Here, it is undisputed that Plaintiff was informed of that evidence, and Plaintiff further admits that he had access to a video synopsis. ECF No. 215 ¶ 103.

38

With respect to Plaintiff's claims about his ability to present witnesses, an "inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566. The undisputed record shows that Plaintiff was afforded a reasonable opportunity to present witness statements, his own statement, and evidence, but that Plaintiff declined to call witnesses until the hearing. Although Defendant Leone did not allow Plaintiff to call witnesses at the hearing itself—in this instance, the involved correctional officers—Leone allowed Plaintiff to review the witness statements of those officers with his advisor. ECF No. 215 ¶ 107. Because an inmate in this circumstance "has no constitutional right of confrontation," *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993), and because Defendant Leone articulated that Plaintiff was provided with the witness statements again before the hearing commenced, *see* Disciplinary Process Summ. Rep., ECF No. 188-9 at 3, the Court concludes that allowing the testimony of witnesses was not necessary in this instance. *Wolff*, 418 U.S. at 566 ("Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases.").

And with respect to Plaintiff's claim that the notice of the hearing's disposition was defective, he offers no details as to how. The Court therefore does not address this argument because it is wholly conclusory.

Finally, insofar as Plaintiff contends that various provisions in the DOC's Administrative Directives were not followed—such as, for instance, a Directive that requires that a copy or listing of physical evidence be given to the inmate or the inmate's advisor at least twenty-four hours prior to the hearing, *see* ECF No. 202 ¶ 107 (citing A.D. 9.5, sections 15 & 16)—the law is clear that

39

state prison directives "do not confer any constitutionally protected rights on inmates . . . and Fourteenth Amendment due process protections are not implicated by the defendants' alleged failure to comply with administrative directives." *Riddick v. Chevalier*, No. 3:11-CV-1555 (SRU), 2013 WL 4823153, at *4 (D. Conn. Sept. 9, 2013).

To the extent Plaintiff disputes the result of the hearing, due process requires that the decision be supported by "some evidence." *Taylor v. Rodriguez*, 238 F.3d 188, 194 (2d Cir. 2001). Here, it is undisputed that that standard is met where Defendant Leone considered the video evidence, the photographs, the correctional officer's statements, and the subsequent investigation. ECF No. 215 ¶ 108; *see also* ECF No. 188-9 at 3.

On this record, and considering Plaintiff's lack of meaningful argument about this claim, the Court finds there is no genuine issue of material fact and grants summary judgment for Defendant Leone on Plaintiff's due process claim related to his disciplinary hearing.

### 2. Defendant Tugie (Administrative Segregation Hearing)

The Court reaches a similar result with respect to Plaintiff's Fourteenth Amendment due process claim related to his administrative segregation hearing.

As noted above, Defendants do not challenge that Plaintiff's liberty interests were implicated here by his placement in administrative segregation.

When an inmate has a liberty interest in remaining free from administrative segregation placement, prison officials must provide him with "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding" the matter, "although not necessarily a full hearing." *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017). Once that has occurred, "prison officials need only conduct an 'informal, nonadversary evidentiary review'" of whether the confinement is justified. *Id.* (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)).

Plaintiff argues that Defendant Tugie violated his procedural due process rights in conducting his administrative segregation hearing.  That hearing occurred on June 3, 2019.  ECF No. 215 ¶ 110.  It is undisputed that Plaintiff signed the Notification of Hearing on May 23, 2019, though Plaintiff claims the notification contained several falsities, without specifying what they are.  *Id.* ¶ 111.  Plaintiff attended the hearing, had an opportunity to speak, and submitted a handwritten statement, though Plaintiff denies his opportunity to speak was meaningful.  *Id.* ¶ 112.  The hearing officer recommended placement in administrative segregation based on a memo from the Warden and an incident report package.   *Id.* ¶ 113.  Plaintiff received notification of this decision after the hearing, though he claims this notification also contained falsities.  *Id.* ¶ 114.

As with Plaintiff's claim related to his disciplinary hearing, Plaintiff does not appear to raise any argument in his opposition materials as to his administrative segregation claim.  And, on the merits, nothing in this record suggests that prison officials failed to provide with "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding" the matter.  *Proctor*, 846 F.3d at 609.  Plaintiff signed the hearing notice and prepared a written statement in advance of the hearing.  ECF No. 215 ¶¶ 111–112.  Plaintiff submits in conclusory fashion that the incident report package contained false information, but this is insufficient to create a genuine dispute of material fact.

As with the disciplinary hearing, to the extent Plaintiff disputes the result of the hearing, due process requires only that the decision be supported by "some evidence."  *Taylor*, 238 F.3d at 194.  Here, that standard is met, where Defendant Tugie considered the incident report package and the Warden's memorandum.  ECF No. 202 ¶ 113.

The Court therefore concludes that there are no genuine issues of material fact and grants summary judgment for Defendant Tugie on Plaintiff's due process claim related to his administrative segregation hearing.

## IV.    CONCLUSION

For the reasons described herein, Defendants' Motion for Summary Judgment, ECF No. 188, is **GRANTED IN PART AND DENIED IN PART**.  The motion is granted except as to Plaintiff's First Amendment retaliation claim against Defendant Officer Gardiner and his Eighth Amendment excessive force and failure to intervene claims against Defendants Officer Gardiner, Officer LaMountain, Lieutenant Bosque, Officer Andreas, Lieutenant Mihaliak, Officer O'Neil, and Officer Yohe.  The Clerk is directed to terminate Defendants Burns, Zahedi, Leone, and Tugie from this action.

The Court will convene a conference with the parties to refer them to a pre-trial settlement conference with a U.S. Magistrate Judge and to set dates for pre-trial submissions and trial as to the remaining claims.

**SO ORDERED** at Hartford, Connecticut, this 31st day of March, 2026.


_/s/ Sarala V. Nagala_
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE